IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

HENRY TIMBERLAKE DUNCAN,

      Plaintiff,

v.                                           Case No. 3:18-cv-01355

EXECUTIVE DIRECTOR DAVID FARMER,
et al.,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the court are Plaintiff's second amended complaint filed pursuant to 42 U.S.C. § 1983 and Defendants' motions to dismiss. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

For the reasons that follow, the undersigned respectfully **RECOMMENDS** that the presiding district judge **GRANT** the motion to dismiss filed by Defendants Keefe Commissary Network, LLC, and Janice Dennison, (ECF No. 146), and the motion to dismiss of Defendant Rachel Adkins, (ECF No. 236); **DISMISS**, with prejudice, the second amended complaint against the foregoing defendants; and **REMOVE** them as defendants in this civil action. The undersigned further **RECOMMENDS** that the presiding district judge **DENY, in part**, the remaining defendants' motions to dismiss on the issues of exercise, administrative segregation, excessive force, and failure to

protect, (ECF Nos. 132, 135, 137, 141, 143, 159, 166, 168, 170, 172, 175, 180, 182, 184, 197, 199, 201, 205, 214, 216, 219, 228, 230), and **GRANT** Defendants' motions to dismiss all other asserted claims. *(Id.).*

I.    **Relevant Facts and Procedural History**

    *A.*    *Complaint*

On October 9, 2018, Plaintiff Henry Timberlake Duncan ("Duncan"), a prisoner incarcerated in the Northern Correctional Facility in Moundsville, West Virginia filed a *pro se* complaint pursuant 42 U.S.C. § 1983, asserting numerous claims regarding his incarcerations in the Western Regional Jail in Barboursville, West Virginia (hereinafter the "WRJ"), and the Huttonsville Correctional Center located in Huttonsville, West Virginia. (ECF No. 2). Duncan chose to proceed with his claims concerning Huttonsville Correctional Center in another action that was pending in this court, 3:18-cv-01373, and to prosecute his claims regarding the WRJ in the present matter. (ECF No. 193 at 3-4). Therefore, Duncan sought leave to file an amended complaint that included only his allegations regarding his incarceration in the WRJ. (ECF No. 8). The court granted his motion, and Duncan's amended complaint, which was dated January 29, 2019, was docketed in this action. (ECF Nos. 10, 11).  In his amended complaint, Duncan claimed that, during his incarceration in the WRJ, he was denied outdoor recreation, hygiene items, the ability to shower, commissary privileges, legal materials, his Bible and religious materials, stamped envelopes, writing supplies, and a bed mat. (ECF No. 11). Also, Duncan claimed that he was not afforded due process before being placed on property restriction and other heightened security classifications and that the defendants conspired to punish him for alleged infractions. *(Id.).*

On March 26, 2019, Duncan filed a motion to supplement his amended complaint. (ECF No. 74). He explained that he received copies of the grievances that he filed at the WRJ, and those documents included details that previously escaped his memory of the events that transpired, including the names of certain defendants and more details regarding the constitutional violations that occurred. (*Id.* at 1). His proposed supplement to his amended complaint added claims that Defendant Mannon (hereinafter "Mannon") "intentionally allowed" eight inmates to cap their cell doors so that the doors did not lock, to escape, and to attack Duncan with a "push broom bottom." (ECF No. 74-1 at 6-7). Duncan claimed that Mannon ignored his pleas for help during the attack, and then, after the incident, Defendant Sergeant Adkins (hereinafter "Sergeant Adkins") put Duncan on the ground, and Defendant Keaton (hereinafter "Keaton") sprayed Duncan "point blank in the face" with "MK-9." (*Id.* at 7-8).

On July 30, 2019, Duncan filed a motion to amend his amended complaint, and he attached the proposed second amended complaint that combined all of his previously asserted claims into one document. (ECF Nos. 85, 85-1). The undersigned held a status conference and motions hearing on August 15, 2019. (ECF No. 88). After discussing the status of the case, Duncan orally moved to withdraw his March 2019 motion to amend because the matters contained in the attached proposed amended complaint were incorporated into his more recent July 2019 proposed second amended complaint. (ECF No. 89 at 2). The court granted Duncan's motion to amend filed in July 2019, instructed the Clerk to file the second amended complaint as of the date of the hearing on August 15, 2019, and advised Duncan that the second amended complaint superseded all other complaints filed herein. (*Id.*).

Duncan states in his second amended complaint that he was a pretrial detainee at the WRJ from August 26, 2015 until April 26, 2017, and he was a convicted prisoner at the WRJ from April 26, 2017 until October 10, 2017, after which he was moved to another facility. (ECF No. 90 at 5). He alleges that he was at all times during his incarceration in the WRJ "housed in the segregation units on protective custody." (*Id*.). He asserts the following claims in his second amended complaint:

### 1. Exercise

Duncan was only permitted to go outside for recreation on a few occasions from August 26, 2015 until October 10, 2017. (*Id*. at 6). He was denied permission to exercise in the dayroom when he was out of his cell, and he was never allowed to go to the gym. (*Id*.). As a result of not receiving adequate outdoor recreation, Duncan suffered back pain, muscle spasms, cramps, headaches, fatigue, loss of muscle mass, weight gain to the point of becoming overweight, loss of stamina, stiff joints, depression, anxiety, lethargy, and insufficient sunlight and "vitamins gained from the sun light." (*Id*. at 9, 32). All of the defendants except for the commissary defendants denied him adequate outdoor recreation. (*Id*. at 33).

### 2. Security Classification

As a result of an "incident," Defendant Morrison (hereinafter "Morrison") placed Duncan on "2-man" from January 21, 2017 until February 8, 2017," which meant that he could not leave his cell without 2 officers present and he was in full restraints. (*Id*. at 9-10). Morrison knew that Duncan would be denied regular hygiene opportunities and outside recreation if he was on "2-man." (*Id*. at 12). Duncan was never charged with a rule violation regarding the incident that prompted him being put on "2-man," never received a hearing to determine that he should be placed on "2-man," and was never given a

4

hearing to be released from "2-man." (*Id.* at 9). On January 21, 2017, Morrison also placed Duncan on administrative segregation status, which he remained on it for approximately nine months. (*Id.* at 9). Finally, on January 23, 2017, Duncan was placed on "lockdown for 27 days due to another incident." (*Id.* at 10).

### 3. Hygiene

Duncan was not allowed to shower for 10 days when he was initially placed on "2-man," and then six more days elapsed before his second shower. (*Id.* at 10). In addition, on April 9, 2017, contraband was supposedly found in Duncan's cell. (*Id.* at 13). As a result, he was placed on "property restriction," which resulted in all personal and state-issued property being removed from his cell, except for a roll of toilet paper. He was not allowed to keep soap in his cell to wash his hands after using the bathroom and was denied clean clothes, a towel, and supplies to brush his teeth, so he could not brush his teeth during that time. (*Id.* at 14, 20). Also, on April 19, 2017, Duncan was denied deodorant. (*Id.* at 15). Due to the unsanitary conditions, he developed skin rashes, which caused pain, chafing, and irritation. (*Id.* at 23). All of the defendants except the commissary defendants violated his right to safe and sanitary living conditions. (*Id.* at 34).

### 4. Commissary

Duncan's commissary privileges were revoked for 27 days, beginning on January 23, 2017, while he was on lockdown for another "incident." (*Id.* at 10). Then, after contraband was purportedly found in his cell, Duncan's commissary privileges were revoked from April 12, 2017 through September 2017. (*Id.* at 16, 22).

### 5. Religious Material

During the property restriction from April 12, 2017 until April 24, 2017, Duncan was unable to effectively practice his religion because his religious material was removed

from his cell. (*Id*. at 21). His Bible was returned to him on April 24, 2017. (*Id*. at 20).

### 6. Access to Courts

Duncan's legal materials were also removed from his cell during the property restriction on April 12, 2017 until April 24, 2017. (*Id*. at 14). He was allowed access to his legal materials only once during that time period, although his criminal trial was scheduled to begin on April 26, 2017. (*Id*. at 15). Also, on April 19, 2017, "Janice, a Keefe contract worker in charge of [the] commissary at WRJ, refused to give [Duncan] his indigent pack," which included stamped envelopes and writing supplies because Aldridge said that Duncan could not have those things while on property restriction. (*Id*.). Duncan could not communicate with his lawyer because his lawyer did not accept collect calls, Duncan "did not have money on his phone," and he was not given his indigent-stamped envelopes, paper, and pen. (*Id*.). As a result of not being able to prepare for trial, Duncan "had to take a Kennedy plea" to the criminal charges. (*Id*.).

Duncan was further refused writing materials to take notes during his April 13, 2017 video conference with the undersigned in cases 3:16-cv-11097 and 3:16-cv-11100, and he "became confused in his lawsuit because of this." (*Id*. at 14).

### 7. Bed Mat

During Duncan's property restriction from April 12, 2017 until April 24, 2017, he could only have his bed mat and linens from 11:00 p.m. to 7:00 a.m. Officers gave him his mat late seven times, but he still had to return the mat at 7:00 a.m. (*Id*. at 18-19). Further, the time frame that he was provided a mat to sleep was the same time frame that he was permitted to leave his cell for hygiene and outside recreation, which forced him to choose between those activities. (*Id*. at 19). Duncan had to lie and sleep on cold bare concrete most of the time, and he suffered from lack of sleep, depression, anxiety, and sores on his

body. (*Id*. at 21-22).

### 8. Failure to Protect

Mannon intentionally allowed eight inmates to cap four different cell doors so that the doors did not lock. On July 21, 2017, the inmates escaped and attacked Duncan from behind while he was watching television. (ECF No. 90 at 23). One inmate hit Duncan in the back of his head with the "bottom of a push broom," and Duncan was punched and kicked until he was "knocked out." (*Id*.). When he regained consciousness, he went to his cell and pushed the call button for Mannon to shut his cell door, but she refused to acknowledge the call button. (*Id*. at 24). Duncan began kicking his cell door "really hard and yelling help again." (*Id*.). The inmates reappeared and surrounded Duncan. Mannon continued to ignore his pleas for help, at which time one of the attacking inmates threw the push broom bottom at Duncan's head from approximately three feet away and Duncan "partially blocked it with his left wrist." (*Id*.). Duncan continued pressing the call button, yelling for help, and kicking the door until Mannon finally shut the door. (*Id*.). The inmates were still standing at his door when Mannon shut it. (*Id*.).

Although the ringleader of the inmates who assaulted Duncan was known to be violent and had attacked inmates on at least two prior occasions, no precautions were taken to protect Duncan. Duncan personally witnessed the inmate attack other inmates four to six weeks earlier, and that inmate had similarly capped his door to assault the other victims. (*Id*. at 27, 29). Inmates at the WRJ capped their doors on almost a daily basis and "staff and administration knew of this and did not do anything to change it." (*Id*. at 29). Duncan still suffered pain in his wrist from blocking the push broom bottom, and he had continuing physical and mental trauma from the assault. (*Id*. at 31).

### 9. Excessive Force

After the assault, Sergeant Adkins took Duncan out of his cell and put him on the ground face-down with his weight on Duncan's back even though Duncan was not resisting. (*Id*. at 25). Keaton then walked up and sprayed Duncan "point blank" in the face with "MK-9 O.C. spray." (*Id*. at 25-26). Duncan asked Keaton why he sprayed him, and Keaton responded that he had never sprayed anyone before and "wanted to see what it was like." (*Id*. at 30).

### 10.    False Report and Failure to Investigate

While in the interview room after the incident, Duncan heard Sergeant Adkins conspiring with the other officers that responded to the assault regarding how to write up their reports since Keaton was not allowed to spray Duncan. (*Id*. at 26-27). Also, Mannon lied and stated that only two inmates attacked Duncan. (*Id*. at 24-25). Sergeant Adkins refused to investigate the other six inmates involved in the assault, although Duncan told him that eight inmates attacked him. (*Id*. at 30-31).

### 11.    Supervisory Liability

Executive Director Farmer; Administrators Crawford, King, and Wolfe; Captains Aldridge and Savilla; Lieutenants Fleming, Hill, and Morrison; Sergeants Adkins, Brewer, Ferguson, Pauley, and Stephens; and Corporals Davis, Diamond, Phillips, Sibera, and York "failed to hire, train and/or supervise their subordinates at WRJ while [Duncan] was housed there." (*Id*. at 34).

### 12.    Grievances

Certain defendants to whom Duncan addressed administrative grievances did not respond, and those who did respond were "deliberately indifferent to the violations of his constitutional rights." (*Id*. at 33).

8

Duncan asserted that the foregoing conduct by Defendants violated his rights under the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Id.* at 33-34). In addition, Duncan asserted that Defendants violated his rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. (hereinafter "RLUIPA"). (*Id.* at 34). In his prayer for relief, Duncan sought declaratory judgment, compensatory damages, punitive damages, and reimbursement of his costs. (*Id.* at 36).

### B. Pending Motions

The majority of the defendants in this action argue that the court should dismiss Duncan's second amended complaint because Duncan fails to allege sufficient facts to state a claim under § 1983 and because the defendants are entitled to qualified immunity in this action. (ECF Nos. 132, 133, 135, 136, 137, 138, 141, 142, 166, 167, 168, 169, 170, 171, 172, 173, 180, 181, 197, 198, 199, 200, 201, 202, 205, 206, 214, 215, 216, 217, 228, 229, 230, 231, 236, 237). In addition, many of the defendants assert that Duncan failed to exhaust his administrative remedies concerning his claims, the claims under RLUIPA fail because the Act does not authorize claims for money damages against state officials, and the claims for declaratory relief are moot due to Duncan's transfer to another prison. (*Id.*).

Defendants Keefe Commissary Network, LLC, (hereinafter "Keefe"), and Janice Dennison (hereinafter "Dennison") filed a motion to dismiss, stating that Keefe is a private entity contracted to provide commissary services at the WRJ, and Dennison is a former Keefe employee who worked at the WRJ. (ECF Nos. 146 at 2). Keefe points out that Duncan asserted that the WRJ staff, not Keefe, placed him on commissary restrictions. (*Id.*). Regarding Duncan's allegation that Dennison refused to give him his indigent pack because he was on property restriction, Keefe cites multiple rulings,

including rulings from this federal circuit, demonstrating that a private contractor selling goods to inmates in a correctional facility is not a public entity or a state actor subject to liability under § 1983. (*Id.* 5-6).

Defendants Jason Slone and Preston Thacker both filed motions to dismiss, asserting that they were not even working at the WRJ at the time of Duncan's incarceration, and they never had any interaction with Duncan. Thus, they claim that there is no basis for liability against them. (ECF Nos. 159, 160, 182, 183). Slone asserted that he has never worked at the WRJ. (ECF No. 159, 160). He explained that he was offered a position, but he did not accept it. (*Id.*). Thacker argued that he left employment at the WRJ almost two full years before Duncan's incarceration. (ECF Nos. 182, 183).

Defendants C.O. Adkins, Keaton, and Mannon filed motions to dismiss. They similarly argue that they are shielded by qualified immunity and that Duncan failed to exhaust his administrative remedies. (ECF No. 176, 185, 220). They additionally assert that Duncan's excessive force claims relating to the incident on July 21, 2017 are barred by the applicable two-year statute of limitations because Duncan did not raise them until the amended complaint on August 16, 2019. (*Id.*).  In her memorandum of law, Mannon moves for summary judgment as an alternative to dismissal under Rule 12(b)(6). (ECF Nos. 185 at 11-12). She notes that Duncan asserted that he was attacked by other inmates at approximately 2330 hours (11:30 p.m.) on July 21, 2017, and he hit his call button, kicked his door, and yelled for help, but Mannon failed to respond. (ECF No. 90 at 23). Mannon attached her WRJ timecard to her motion, which reflects that she worked from 7:46 a.m. until 9:18 p.m. on July 21, 2017. (ECF No. 184-1 at 2). Therefore, Mannon argues that she is entitled to summary judgment in her favor on Duncan's claims, as she was not on duty at the time of the alleged incident and cannot be held culpable for the events

alleged by Duncan. (ECF No. 185 at 13).

In response to the various defendants' motions, Duncan disputes that the defendants are shielded by qualified immunity. He argues that he set forth factual allegations of unconstitutional misconduct by these defendants and identified how the defendants breached their legal duties to him and the injuries that they caused. (ECF No. 163, 165, 193, 210, 234). As to Keefe's argument that it is not amenable to suit under § 1983, Duncan responded that, in certain circumstances, private individuals can be deemed state actors, such as when they are coerced by the state to commit unconstitutional acts or when the state delegates a traditional and exclusive public function to a private actor. He argues that Keefe was clearly engaging in state action under the color of state law and can be sued under § 1983. (ECF No. 186).

Regarding the argument that Duncan's excessive force claims are time-barred, Duncan asserts that he raised his claims relating to the July 2017 incident in his initial complaint filed in October 2018 in case number 3:18-cv-01373,[1] and he transferred his claims from that case to this action via his motion to amend on March 8, 2019. (ECF No. 193 at 9-10). However, according to Duncan, he inadvertently omitted the claims relating to the July 2017 incident and moved to supplement the amended complaint on March 26, 2019, which was well within the two-year statute of limitation. (*Id.* at 10); *see* (ECF Nos. 74, 74-1). Therefore, Duncan asserts that his claims regarding the July 2017 incident relate back to his timely filed pleading and motion to amend. (ECF No. 193 at 11). Further, Duncan argues that Defendants fail to acknowledge any "equitable tolling that would apply." (*Id.*). Duncan notes that he agreed to withdraw the proposed amendment only to

---

[1] Duncan states that the complaint was filed in October 2019, but a review of the docket demonstrates that it was filed in 2018.

file a second amended complaint that contained all of his claims in one document, not to forfeit some of the claims in his pending motion to amend. (*Id.* at 5); *see* (ECF Nos. 89, 90). Further, Duncan contends that the statute of limitations was tolled while he was exhausting available administrative remedies and while the court was conducting initial review of his complaint. (ECF No. 193 at 11-12). Therefore, Duncan states that the excessive force claims are not untimely.

Regarding Mannon's claim that she left work before the attack on Duncan occurred, Duncan asserts that Mannon was still responsible for allowing the prisoners to cap their doors in the four cells at the time that she allegedly left work. (ECF No. 211 at 28). Duncan stated that he "still asserts that [Mannon] coordinated this attack with some of the individuals that attacked him," and "upon information and belief" she "was on duty at the time that he was released for his hygiene and therefore responsible." (*Id.*).

Finally, on May 15, 2020, in response to the Motion to Dismiss of Rachel Adkins, Duncan admits that Rachel Adkins was not a proper defendant. (ECF No. 243). Duncan explains that he meant to name Sergeant Adkins, whose first name is possibly David. (*Id.*). Accordingly, Duncan has no objection to Defendant Rachel Adkins being dismissed as a party.

## II.  <u>Standards of Review</u>

Defendants move to dismiss Duncan's second amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion under Rule 12(b)(6) tests the sufficiency of the complaint. *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007) (stating to survive a 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face"). Accordingly, the court will assume that the facts alleged in the second amended complaint are true and will

draw all reasonable inferences in the plaintiff's favor as the nonmoving party. *Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002). The court will also consider documents attached to the amended complaint as exhibits. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (stating that the court's review is generally limited to a review of the allegations of the complaint itself, but the court also considers documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits).

As the purpose of Rule 12(b)(6) is limited to challenging the adequacy of a complaint, the court does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "Furthermore, when as here, a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, 'we must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged.'" Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quoting *Harrison v. United States Postal Serv.,* 840 F.2d 1149, 1152 (4th Cir. 1988)).

While the court "take[s] the facts in the light most favorable to the plaintiff, ... [the court] need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). A complaint fails to state a claim

when, accepting the plaintiff's well-pleaded allegations as true and drawing all reasonable inferences, the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do" and a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

Courts are required to liberally construe *pro se* complaints, such as the amended complaint filed herein. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, even under this less stringent standard, the amended complaint still must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for her, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

Mannon states that her motion to dismiss could be construed as a motion for summary judgment at the court's discretion. (ECF No. 185 at 11-12). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 501 U.S. at 248. Assertions of material facts must be supported by "particular parts of materials in the record, including depositions,

14

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). The court shall "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine,* 501 U.S. 496, 520 (1991). Consequently, motions for summary judgment impose a heavy burden on the moving party; for, it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson, Inc.,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

### III.  <u>Discussion</u>

Title 42 U.S.C. § 1983 provides a remedy to parties who are deprived of federally protected civil and constitutional rights by persons acting under color of any state "law, statute, ordinance, regulation, custom, or usage." *Id.* The statute "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)) (internal markings omitted). Congress enacted § 1983 "to enforce

provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape*, 365 U.S. 167, 171-172 (1961), *overruled on other grounds by* 436 U.S. 658.

In order to state a cause of action under § 1983, a plaintiff must present facts showing that: (1) a person deprived him or her of a federally protected civil right, privilege or immunity and (2) that the person did so under color of State law. *Perrin v. Nicholson*, C/A No. 9:10-1111-HFF-BM, 2010 WL 3893792, at *2 (D.S.C. Sept. 8, 2010); *see also American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."). If either of these elements is missing, the complaint fails to state a claim for relief under § 1983. *Id.* at 50.

Defendants argue that they are entitled to qualified immunity in this action, because Duncan failed to articulate any facts demonstrating that they engaged in conduct which violated Plaintiff's clearly established rights. Government officials performing discretionary functions may be protected from monetary damages under the doctrine of qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity "is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions." *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). This doctrine protects law enforcement officers in the exercise of their official duties from the risk of personal liability for making

16

"bad guesses in gray areas," ensuring that they are only responsible for "transgressing bright lines." *Marciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). As the United States Supreme Court explained in *Pearson v. Callahan:*

> "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200 (2001).

In determining the applicability of qualified immunity, the court must consider two questions: (1) whether a constitutional or statutory right would have been violated on the facts alleged by plaintiff, and (2) whether the right asserted was clearly established at the time of the alleged violation. *Pearson,* 555 U.S. at 232. These questions may be answered in any order that "[would] best facilitate a fair and efficient disposition of each case." *Id.* at 242. If a court finds that a claimed constitutional right was not clearly established at the time of the alleged wrongdoing, the court may dispose of the case without engaging in the pointless exercise of determining whether the facts alleged actually establish a violation of that right. *Id.* Similarly, if a court determines that the facts alleged by the plaintiff do not support a reasonable inference that a constitutional right

was violated, the analysis terminates, and the Complaint is subject to dismissal for failure to state a claim.

### A. Declaratory Relief

As an initial matter, the undersigned notes that Duncan seeks declaratory relief in this action, although he is no longer incarcerated in the WRJ. (ECF No. 90 at 36). As a prerequisite to the exercise of federal jurisdiction, the complaint before the court must present an actual case or justiciable controversy. "To be justiciable under Article III of the Constitution, the conflict between the litigants must present a 'case or controversy' both at the time the lawsuit is filed and at the time it is decided. If intervening factual ... events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented." *Ross v. Reed*, 719 F.2d. 689, 693-94 (4th Cir. 1983). "The requisite personal interest that must exist at the commencement of the litigation ... must continue throughout its existence." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (citations omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Defendants are correct that "as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009). "The reasons for finding mootness in such a context are clear. Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." *Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir.2007).

An exception to the mootness doctrine exists for claims that are "capable of

repetition, yet evading review." *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007). However, "[j]urisdiction on the basis that a dispute is capable of repetition, yet evading review is limited to the exceptional situation in which (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Incumaa*, 507 F.3d at 289 (internal quotation marks and citations omitted). Furthermore, while a prisoner's transfer or release moots a request for declaratory and injunctive relief, it does not moot a request for monetary damages. *See Taylor v. Rogers*, 781 F.2d 1047, 1048 n. 1 (4th Cir.1986); *see also Salmons v. W. Reg'l Jail Auth.*, No. CV 3:18-1447, 2019 WL 5616916, at *4 (S.D.W. Va. Oct. 30, 2019).

Duncan does not argue that his claims are "capable of repetition, yet evading review," nor would he be likely to succeed on such an argument. As Duncan has been released from the facility wherein the complained of actions took place, to be again subject to the same conditions would require that he be transferred to the WRJ. This chain of events is far too speculative to establish a reasonable expectation that Duncan will again face the conditions that he alleges occurred at the WRJ. Accordingly, the undersigned **FINDS** that Duncan's prayer for declaratory relief have been rendered moot by his transfer from the facility where the alleged constitutional violations occurred, and the undersigned **RECOMMENDS** that his claim for declaratory relief be dismissed.

### B. Claims for Monetary Damages

#### 1. Exercise

Duncan states that all Defendants, except for the commissary defendants, were personally aware and responsible for denying him outside recreation. (ECF No. 90 at 5-

8). He claims that he was supposed to receive recreation in an outdoor area pursuant to Jail Policy, and he asked the correctional officer defendants for outside recreation, even advising them that he had not received it in a while. He also filed numerous grievances to that effect. Duncan requested, in the alternative, that he be permitted to exercise indoors. (ECF Nos. 90 at 6, 8; 90-1). Duncan contends that, despite his pleas, he was only permitted to go outside for recreation on very few occasions from August 26, 2015 until October 10, 2017; was denied permission to exercise in the dayroom when he was out of his cell; and was never once allowed to go to the gym. (ECF No. 90 at 6). He claims that, as a result of not receiving adequate outdoor recreation, he suffered back pain, muscle spasms, cramps, headaches, fatigue, loss of muscle mass, weight gain to the point of becoming overweight, loss of stamina, stiff joints, depression, anxiety, lethargy, and insufficient sunlight and lack of "vitamins gained from the sun light." (*Id.* at 9, 32).

Duncan was a pretrial detainee during the majority of the time period that he was purportedly denied recreation. Under the Fourteenth Amendment, a pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to any form of punishment. *Riddick v. Willett*, No. 3:15CV361, 2016 WL 3282213, at *4 (E.D. Va. June 10, 2016) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)). In order to determine whether a condition imposed upon a pretrial detainee constitutes punishment, the court must decide whether the condition "was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 538-40 (1979)).

"The relevant precedent teaches that 'punishment, whether for a convicted inmate or a pretrial detainee, is the product of intentional action, or intentional inaction,

respecting known and *substantial* risks of harm.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)). Furthermore, the challenged condition only constitutes punishment where it causes injury. *Id.* "There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* (quoting *Bell*, 441 U.S. at 539 n.21).

In considering pretrial detainees' denial of recreation claims, district courts within the Fourth Circuit apply an Eighth Amendment analysis. *See, e.g., Doe v. DeWees*, No. TDC-18-2014, 2020 WL 1331902, at *16 (D. Md. Mar. 23, 2020). The deprivation of exercise can violate the Eighth Amendment's protection against cruel and unusual punishment. *Rivera v. Mathena*, 795 F. App'x 169, 172–73 (4th Cir. 2019) (citing *Mitchell v. Rice*, 954 F.2d 187, 193 (4th Cir. 1992). However, "[l]ooking at the 'totality of the circumstances,' including the duration of harm, is important in determining an Eighth Amendment violation. *Id.* (citing *Mitchell*, 954 F.2d at 191). For instance, a restriction to two exercise periods per week might not violate "the Eighth Amendment if confined to a relatively short period of maximum confinement," but if extended over a period of years and perhaps indefinitely, "the rule may be quite different." *Id.* (citing *Mitchell*, 954 F.2d at 191 (explaining that a "complete deprivation of exercise for an extended period of time violates Eighth Amendment prohibitions against cruel and unusual punishment")).

In terms of outdoor exercise, "[i]t is well settled that jails may provide space for indoor exercise and recreation as an alternative to outdoor recreational facilities, absent medical evidence demonstrating a need for outdoor exercise." *Jones v. Kelly*, 1990 WL 33936, at *1 (4th Cir. 1990) (citing *Clay v. Miller,* 626 F.2d 345 (4th Cir. 1980)). Prisoners should generally be permitted some regular out-of-cell exercise. *Mitchell*, 954 F.2d at 191. However, the denial of out-of-cell exercise opportunities is not *per se* unconstitutional cruel and unusual punishment. *Id.* "[P]enological considerations may, in certain

21

circumstances, justify restrictions." *Id.*

The Eighth Amendment "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (*citing Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)). However, "[p]rison conditions may be 'restrictive and even harsh.'" *Farmer*, 511 U.S at 833 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981) ("To the extent that [prison] conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."). "The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments." *Strickler v. Waters,* 989 F.2d 1375, 1381 (4th Cir. 1993). Thus, not every uncomfortable condition of confinement is actionable. *Rhodes,* 452 U.S. at 347. Ultimately, this prohibition "does not mandate comfortable prisons, and only those deprivations denying the 'minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347).

In order to prosecute a case under the Eighth Amendment, a plaintiff must show both (1) the deprivation of a basic human need that was "sufficiently serious," when measured by an objective standard, and (2) that the responsible prison officials had a "sufficiently culpable state of mind." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). To satisfy the objective component, the plaintiff must show that the challenged condition caused or constituted an extreme deprivation. *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o demonstrate such an extreme deprivation, [the plaintiff] must allege a serious or

significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from [his] exposure to the challenged conditions." *Odom v. South Carolina Dept. of Corrections*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 634). "Compelling a showing of significant physical or emotional harm, or a grave risk of such harm, infuses an element of objectivity into the analysis, lest resolution of the seriousness of the deprivation devolve into an application of the subjective views of the judges deciding the question." *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir. 1995) (citing *Strickler,* 989 F.2d at 1370–80).

"*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at 304 (emphasis in original). However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

To fulfill the subjective component, the plaintiff must demonstrate that each individual named in the complaint acted with "deliberate indifference" to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834. The Supreme Court explained:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Deliberate indifference is more than mere negligence but less than malice. *Flores v. Stevenson,* Civil Action No. 2:11–cv–01278–TMC–BHH, 2012 WL

23

2803721 (D.S.C. May 11, 2012). Put simply, the individuals named in the complaint would have a sufficiently culpable state of mind if they were each aware of an excessive risk of harm to the plaintiff's health or safety, but disregarded it. *See Wilson*, 501 U.S. at 298; *Brown v. North Carolina Dept. of Corrections*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)) ("[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.").

In *Rivera*, the plaintiff alleged that he was denied showers and recreation in contravention of his Eighth and Fourteenth Amendment rights. *Rivera*, 795 F. App'x at 172. The plaintiff was housed in segregation for four years. *Id*. At that particular correctional institution, inmates in segregation were in solitary confinement and typically confined to their cells for 24 hours per day unless participating in one of the few out-of-cell activities offered, which primarily included showering or outdoor recreation. *Id*. While in segregation, Rivera did not shower for almost eight weeks and did not exercise for about two months, and he frequently received one or two showers per week and zero, one, or two exercise opportunities per week. *Id*. at 175. The Fourth Circuit held that the combination and duration of the shower and exercise deprivations were sufficiently lengthy and severe over the course of the inmate's four years in segregation to provoke constitutional concerns and satisfy the objective component of the Eighth Amendment test. *Id*. The court noted that Rivera suffered injuries and faced a substantial risk of serious harm as a result of long periods without showers and recreation. *Id*. He produced evidence that he suffered emotional and mental deterioration, depression, low energy, difficulty sleeping, headaches, and loss of appetite. *Id*. The Fourth Circuit found that those injuries were sufficient to support an Eighth Amendment claim. *Id*. The court emphasized

the "heavy psychological toll" exacted by prolonged solitary confinement, and noted that Rivera "thus depended on regular showers and exercise periods as one of the few times to leave his cell in order to maintain his physical, mental, and emotional health." *Id.*

Regarding the subjective component, the Fourth Circuit noted that Rivera filed numerous grievances challenging the denial of his showers and exercise sessions, alerting the staff to his issues. *Id.* at 176. He also left notes on his door stating that he wanted showers and recreation, and the log sheets on his door showed that he missed extensive shower and exercise opportunities. *Id.* Thus, the Fourth Circuit determined that, even if certain defendants were not advised that Rivera was suffering mental and physical harm as a result of the denial of regular recreation and showers, the risks posed would have been obvious to them. *Id.* The court also cited the Virginia Department of Corrections Operating Procedure, which made "clear the significance of providing routine recreation and shower opportunities to prisoners in segregation." *Id.* For all of those reasons, the Fourth Circuit found that the plaintiff presented sufficient evidence to establish genuine issues of material fact on his conditions of confinement claim. *Id.* at 175, 176.

In this case, although Duncan focuses on outdoor recreation, his allegations are most liberally construed as a near total deprivation of exercise. Reading the second amended complaint as a whole in the light most favorable to Duncan, he asserts a plausible claim that he was denied outdoor exercise except on a few occasions over the course of almost two years, and he was denied the opportunity to exercise indoors as an alternative because he was prohibited from exercising in the dayroom when he was out of his cell, and he was never allowed to go to the gym. He contends that he suffered numerous physical and mental injuries, some of which reflect the same injuries that were sufficient to state a claim in *Rivera*, and some injuries that could be considered more

severe, including the loss of muscle mass and significant weight gain.

Duncan asserts that he made the defendants aware that he was being denied recreation opportunities and he filed numerous grievances alerting them to his risk of harm. Furthermore, he references Jail policies, which could have put the defendants on clear notice that Duncan was entitled to exercise opportunities in order to maintain his mental and physical health. It is true that "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation." *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013). However, the Fourth Circuit noted in *Rivera* that such policies were an additional indicator to the defendants regarding the importance of providing routine recreation opportunities to inmates.

In reviewing the motions to dismiss, the court must assume that the facts alleged in Duncan's second amended complaint are true and it must draw all reasonable inferences in his favor. Therefore, the undersigned **FINDS** that Duncan adequately states a constitutional violation regarding the denial of exercise. Accordingly, the undersigned **RECOMMENDS** that the presiding district judge deny the defendants' motions as to dismiss this claim.

### 2. Security Classification

In his next claim, Duncan asserts that Morrison placed him on administrative segregation status for nine months beginning on January 21, 2017. (ECF No. 90 at 9). Duncan purportedly requested to be taken off administrative segregation and protective custody and instead placed in general population, but Morrison denied the request. (*Id.*). Duncan asserts that he was additionally placed on "2-man" from January 21, 2017 until February 8, 2017 (19 days), which meant that he could not leave his cell without two

officers present and he was in full restraints, and his hygiene and recreation opportunities were limited during that time. (*Id.* at 9-10). In Duncan's administrative grievance attached to his second amended complaint, Duncan stated was on "2-man" because he admittedly "shit-bomb[ed]" someone. (ECF No. 90-1 at 29). Nonetheless, he complains that he was never givne a hearing to determine that he should be placed on "2-man," even though he was never charged with a rule violation regarding the incident that caused him to receive that classification, and he was never given a hearing to be released from "2-man." (ECF No. 90 at 9). He argues that Morrison intentionally violated his rights to equal protection, due process, and to be free from cruel and unusual punishment. (*Id.* at 12). According to Duncan, Morrison put him on "2-man" knowing that he would not get hygiene and outside recreation on a regular basis in order to punish Duncan while he was a pretrial detainee. (*Id.* at 12-13). Duncan notes that he was never written up for the reason he was placed on "2-man," and "the disciplinary process was skipped by Morrison when he took things into his own hands." (*Id.* at 13). Finally, Duncan asserts that he was on "lockdown" from January 23, 2017 until February 19, 2017 (27 days), during which time his gym and commissary privileges were revoked, and he was only allowed out of his cell for hygiene and outside recreation between the hours of 11:00 p.m. until 7:00 a.m. (*Id.* at 10).

Duncan's reference to his placement in lockdown does not articulate a due process or equal protection challenge, but rather relates to the restrictions that it imposed on his outside recreation, commissary privileges, and hygiene opportunities, all of which implicate their own constitutional considerations, which are addressed individually in the preceding and subsequent sections. However, regarding his security classifications, Duncan also asserts that his due process and equal protection rights were violated when

he was placed on "2-man," and he references his long-term placement in administrative segregation.

Duncan was a pretrial detainee during the time that he was on "2-man" and a portion of the time that he was in administrative segregation. As noted, a "pretrial detainee has a right under the Due Process Clause to be free from punishment before his guilt is adjudicated." *Tate v. Parks*, 791 F. App'x 387, 390 (4th Cir. 2019). A pretrial detainee may assert a substantive due process challenge, alleging that prison conditions are so disproportionate or arbitrary that they are not related to legitimate penological objectives and amount to punishment. *Id.* (citation omitted). "To prevail on such a claim, a detainee must show that the challenged treatment or conditions were either (1) imposed with an express intent to punish, or (2) not reasonably related to a legitimate nonpunitive objective, in which case an intent to punish may be inferred." *Id.* A pretrial detainee may also assert a procedural due process violation based on the conditions of his pretrial confinement. *Id.* "Jail officials may impose nonpunitive restrictions on a pretrial detainee for disciplinary or administrative reasons, but, as these restrictions implicate a detainee's liberty interests, he is entitled to certain procedural protections." *Id.* When the restrictions are imposed as a disciplinary measure for institutional misconduct, the detainee must be provided notice, a hearing, and a written explanation of the disciplinary action. *Id.* Alternatively, when the restrictions are imposed instead for administrative reasons, the detainee is owed some notice of the proposed action and an opportunity to present his views. *Id.* In any event, the detainee must be afforded periodic review of his confinement. *Id.* A detainee may also raise an equal protection claim related to his placement in segregation. *Id.* at 391. To do so, the detainee must prove that "he was treated differently than other similarly situated inmates as a result of intentional

discrimination and that his disparate treatment was not rationally related to any legitimate penological interest." *Id.*

Duncan was a convicted prisoner for the remainder of the period that he was in administrative segregation. "A convicted inmate's federally protected liberty 'interests are limited to the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Tower v. Winston*, No. 7:18CV00368, 2018 WL 6037544, at *2 (W.D. Va. Nov. 16, 2018) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Thus, "[i]f the housing status the inmate challenges did not impose atypical hardship on him, then he has no federally protected liberty interest and, thus, no constitutional right to particular procedural protection related to that assignment." *Id.* (citing *Sandin*, 515 U.S. at 486-87). Nevertheless, "as a practical matter, the contours of the Due Process Clause in the detainee context tend to be coextensive with the substantive constitutional principles applied via the Eighth Amendment to convicted inmates." *Id.* at *1 n.3.

In *Tate*, a pretrial detainee argued under § 1983 that he was placed in administrative segregation as punishment for attempted escape in violation of the Due Process Clause, and he stated that other inmates at the jail who had been charged with or found guilty of escaping or attempted escape were not put in administrative segregation, which was a violation of the Equal Protection Clause. *Id.* at 389. Tate was confined to his cell for 23 hours per day in segregation, and he was not permitted visits from family. *Id.* "Despite his frequent requests to be moved and to have his placement reviewed, and the documented deterioration of his mental condition, Tate was not removed from solitary

29

confinement for at least a year and a half." *Id.*

The Fourth Circuit disagreed with the district court's finding that there was no express intent to punish Tate when placing him in segregation and that no intent to punish Tate could be inferred. *Id.* at 390. The Fourth Cicuit stated that, [i]n evaluating whether there is an intent to punish, a court may not simply accept the defendant's justification for placing a detainee in administrative segregation but must meaningfully consider whether the conditions of confinement were reasonably related to the stated objective, or whether they were excessive in relation thereto." *Id.* (citation and markings omitted). The Fourth Circuit noted that Tate was in solitary confinement for a prolonged period of time during which he was restricted to his cell for 23 hours per day, with no visitors, and extremely limited opportunities to exercise, access the library, or interact with anyone else. *Id.* Also, the Fourth Circuit cited that Tate's "circumstances changed materially during his solitary confinement, in ways that might have warranted reconsideration of the restrictions placed upon him." *Id.* at 391. Specifically, "Tate did not again attempt to escape or incur any disciplinary interactions while in segregation, and his mental condition deteriorated significantly during this confinement." *Id.* However, there was no reevaluation of Tate's placement in solitary confinement, which the Fourth Circuit found undermined the assertion that keeping Tate in solitary confinement for such an extended period of time was reasonably related to maintaining safety and security. *Id.* Accordingly, the Fourth Circuit found that the facts of the case warranted reconsideration of Tate's due process claim. *Id.* Regarding Tate's equal protection claim, the Fourth Circuit noted that Tate named in his amended complaint several inmates who he alleged were not put in administrative segregation despite having been charged with, or found guilty of, escaping or attempting to escape. *Id.* The district court had foreclosed him from

discovering any information related to this claim before granting summary judgment against him. The Fourth Circuit found that the decision was erroneous and likewise remanded the equal protection claim for reconsideration. *Id.*

First, addressing Duncan's claim regarding "2-man," Duncan asserts that Morrison imposed this restriction solely to punish him, knowing that he would receive less outside recreation and hygiene, without Duncan being charged with an infraction or receiving any modicum of due process. This claim is reminiscent of a recent case within the Fourth Circuit. In *Crisano v. Grimes*, the defendants moved to dismiss a plaintiff's claim that she was improperly placed in administrative segregation for "over 210 days" as a pretrial detainee, a classification which meant "no phone and no mail status and 2-man full restraint to court." *Crisano,* No. 1:19CV1612 (CMH/TCB), 2020 WL 1919913, at \*1,3 (E.D. Va. Apr. 20, 2020). The plaintiff admitted in the complaint that she was put in administrative segregation because she tried to hire someone to commit a murder while she was detained in the jail. *Id.* at \*2. The district court noted that a pretrial detainee has the right to due process before being placed in segregation as punishment. *Id.* at \*7 (citing *Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016)). However, the district court stated that Supreme Court precedent recognized that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* (quoting *Bell*, 441 U.S. at 546). The court concluded that the jail defendants "did not act with the intent to punish plaintiff, but to prevent and deter crime, and to maintain institutional security and preserve internal order." *Id.* The district court explained that, to the extent that the plaintiff alleged a due process violation, such a claim had no merit or factual support because if "a restriction imposed by the jail officials is for

administrative purposes - which include managerial and security needs - the level of process to which the pretrial detainee is entitled is diminished." *Id.* (quoting *Williamson v. Stirling*, 912 F.3d 154, 175 (4th Cir. 2018)). The district court explained that a "jail may take immediate preventative action to segregate a detainee for safety or security reasons after serious criminal or violent conduct." *Id.* (citing *Dilworth*, 841 F.3d at 255).

Similarly, in this case, Duncan was restricted to "2-man" for a limited period of time after admittedly "shit-bomb[ing]," which is understood to mean throwing feces at other individuals. (ECF No. 90-1 at 29). As the response to Duncan's WRJ grievance stated, such a practice is unsanitary and distasteful, and it has the potential to spread disease. (*Id.* at 46). Like the plaintiff in *Crisano*, Duncan does not assert a legitimate claim that his due process rights were violated when he was placed on "2-man" for 19 days as a security measure following the above incident. Moreover, he does not articulate a viable equal protection claim. He does not assert facts that similarly situated inmates were treated differently than him with respect to his placement on "2-man."

However, Duncan's reference to administrative segregation is more complex. The precise contours of his placement in administrative segregation are no clear from the second amended complaint, including why Duncan was in administrative segregation and what that classification entailed. Duncan states that he was incarcerated in the WRJ from August 26, 2015 until October 10, 2017. (ECF No. 90 at 5). He states that he was at all times during his confinement housed in the segregation units in protective custody. (ECF No. 90 at 5). He references that inmates in segregation units were only allowed out of their cells to use the phone, shower, or kiosk, or to clean their cells. (*Id.* at 6-7). According to Duncan, if the inmates were observed not doing one of those things, they were "locked down" for the rest of the day. (*Id.* at 7). The inmates purportedly had no longer than one

hour to do the activities described above, and they were "locked down" as soon as they were finished. (*Id.*). Duncan states that Morrison put him in administrative segregation in January through October 2017. (*Id.* at 9). Yet, Duncan admits that he was out of his cell watching television in July 2017. (*Id.* at 23).

Duncan states a viable claim due process challenge regarding his placement in administrative segregation. Assuming the facts pleaded by Duncan as true, given the length of time that Duncan was in administrative segregation, the alleged restrictions that it imposed, and the lack of information as to why he received that designation, this claim is cognizable under *Tate* and related cases.

Therefore, the undersigned **FINDS** that Duncan does not state a claim under § 1983 regarding his placement in "2-man" or lockdown, and the undersigned **RECOMMENDS** that the presiding district judge dismiss these claims. However, the undersigned **FINDS** that Duncan states a due process claim regarding his placement in administrative segregation, and the undersigned **RECOMMENDS** that the presiding district judge deny defendants' motions to dismiss this claim.

### 3.    Hygiene

Duncan asserted that while on "2-man" security custody in late January and early February 2017, he was not allowed to shower for 10 days, and then six more days elapsed before his second shower. (ECF No. 90 at 10). In addition, Duncan was on property restriction from April 13, 2017 until April 24, 2017 after contraband was supposedly found in his cell, and all personal and state-issued property was removed from his cell, except for a roll of toilet paper.[2] (*Id.* at 13, 20). He was not allowed to keep soap in his cell to

---

[2] Duncan asserts that his religious, writing, and legal material were removed on April 12, 2017 and his soap and "everything else" was removed on April 13, 2017. (ECF No. 90 at 13).

wash his hands after he used the bathroom, and he was not given clean clothes, a towel, soap, or supplies to brush his teeth when "out for hygiene" so could not brush his teeth during that time. (*Id*. at 14, 20). In addition, on April 19, 2017, Duncan was allegedly not provided deodorant. (*Id*. at 15). Duncan asserted that, as a result of the unsanitary conditions, he developed skin rashes, which caused pain, chafing, and irritation. (*Id*. at 23). Duncan further claimed that, after he was pepper sprayed on July 21, 2017, he was taken to the medical unit and allowed to use the eye wash station, but he was put in an interview room for seven hours without a shower, and he was then locked in his cell. (*Id*. at 27). In his administrative grievance, Duncan reiterated that he was taken to medical and allowed to rinse his eyes, but he stated that he had to wait only five and one-half hours for a decontamination shower. (ECF No. 90-1 at 56).

First, the undersigned addresses Duncan's claim regarding infrequent showers. Duncan's assertion that he received only two showers during his first 16 days in "2-man" occurred while he was a pretrial detainee, while his claim that he could not shower for seven hours after being pepper sprayed took place after his conviction. Nevertheless, "[t]he constitutional protections afforded to a pretrial detainee under the Fourteenth Amendment are similar to those provided by the Eighth Amendment." *McClellan v. Monyei*, No. CV PWG-17-3307, 2019 WL 859217, at *5 (D. Md. Feb. 21, 2019) (citing *Bell*, 441 U.S. at 535). The Eighth Amendment proscribes cruel and unusual punishment of convicted prisoners, and the Fourteenth Amendment disavows punishment of pretrial detainees.

While the denial of the ability to shower can certainly violate an inmate's constitutional rights under certain circumstances, Duncan states in his second amended complaint and attached grievance that his restricted ability to shower on "2-man" was a

very temporary deprivation while he was on a security restriction for throwing feces at someone. He states only that he suffered skin rashes that caused pain, chafing, and irritation due to unsanitary conditions. Therefore, while Duncan's claim that he did not have the opportunity to shower for 10 days on one occasion and six days on a subsequent occasion, is distasteful, it does not present a claim of constitutional proportion. *Howard v. Williams*, No. 90-0125-AM, 1991 WL 199872, at *2 (E.D. Va. June 4, 1991), *aff'd,* 952 F.2d 395 (4th Cir. 1992) (stating that inmate's ability to shower twice in 15 days "was merely a temporary restriction necessarily imposed to maintain order," and while the conditions were undesirable, "the Eighth Amendment is not implicated in this case where there was a need for additional security measures and the period of inconvenience was short."); *Conaway v. Capasso*, No. CV RDB-17-3534, 2018 WL 3092166, at *6 (D. Md. June 22, 2018) ("That he was denied showers during the 17 days prior to his transfer to another pretrial facility does not, under the facts presented here, amount to imposition of an unconstitutional condition of confinement."); *Thompson v. Clarke*, No. 7:17CV00111, 2018 WL 4764294, at *10 (W.D. Va. Sept. 30, 2018) (finding that inmate's claim that he did not shower for four, twelve, and seven days in a consecutive period did not allege a Fourteenth Amendment due process claim, as it was occasional and not atypical significant hardships compared to normal prison conditions).

Regarding the pepper spray, "courts have found Eighth Amendment violations stemming from the withholding by correctional officers of medical attention, showers, or fresh clothing, after a prisoner is exposed to pepper spray, even for a legitimate reason." *Saunders v. Kummer*, No. 2:18-CV-01514, 2019 WL 7597600, at *8 (S.D.W. Va. Dec. 18, 2019), *report and recommendation adopted,* No. 2:18-CV-01514, 2020 WL 247538 (S.D.W. Va. Jan. 15, 2020). In *Saunders*, another division of this court considered a

plaintiff's claim that, during his incarceration, two correctional officer defendants refused to give him a shower for three days after one of them pepper sprayed him for "no reason," despite the fact that the medical providers told them to make sure that he took a shower and advised them that there were burns and irritation on the inmate's "visible & private parts." *Id.* at *1, 8. The district court concluded that a liberal reading of the complaint established facts which could support a finding that the defendants refused to give the plaintiff a shower, as directed, "unreasonably leaving him in pain from the effects of the chemical agents," and those facts, taken as true, could support a finding of deliberate indifference to the plaintiff's health and safety sufficient to support a claim under the Eighth Amendment. *Id.* at *9.

Conversely, in this case, Duncan asserts that he was sprayed in the face after which he was taken to the medical unit and used the eye wash station. While he states that the pepper spray "got all over his body," he does not assert that he suffered any discernable pain or injuries from not being allowed to decontaminate, nor does he assert that any specific individual knew of and disregarded an excessive risk to inmate health or safety. (ECF No. 90 at 30). Therefore, he fails to state a claim under the Eighth Amendment regarding the denial of the ability to shower.

Duncan also claims that, for approximately 11 days, he was not allowed to keep soap in his cell to wash his hands after he used the bathroom, and he was not given clean clothes, a towel, soap, or supplies to brush his teeth when "out for hygiene" so he could not brush his teeth during that time. (ECF No. 90 at 13-14, 20). He was also not provided deodorant on one occasion. (*Id.* at 15). As noted, Duncan asserted that, as a result of the unsanitary conditions, he developed skin rashes, which caused pain, chafing, and irritation. (*Id.* at 23). The "Eighth Amendment is not violated when there is a temporary

36

denial of hygiene items and toiletries." *Hammonds v. Wolfe*, No. CV 3:18-1377, 2020 WL 1243609, at *4 (S.D.W. Va. Mar. 13, 2020); *Ash v. Greenwood*, No. 2:17-CV-03022, 2018 WL 4201398, at *6 (S.D.W. Va. Aug. 30, 2018) (collecting cases). In addition, although a rash could be concluded to establish a significant injury in certain circumstances, Duncan does not assert any serious physical injury under the facts in his second amended complaint. *Smith v. Bledsoe*, No. 7:06-CV-00698, 2007 WL 152117, at *2 (W.D. Va. Jan. 16, 2007) ("Smith's only allegation is that living with this cellmate caused him to sleep irregularly which caused him stress, resulting in a skin rash. While sleeping irregularly and undergoing stress and a skin rash may be inconvenient, uncomfortable, and unfortunate, Smith has not alleged anything to suggest that these conditions violate contemporary standards of decency. Nor has he demonstrated that because of the conditions he has sustained a serious or significant injury or is at risk of a future injury.").

Therefore, the undersigned **FINDS** that Duncan does not assert a claim under § 1983 regarding hygiene restrictions, and the undersigned **RECOMMENDS** that the presiding district judge grant Defendants' motion to dismiss this claim.

### 4.    Commissary

Duncan asserts that his commissary privileges were revoked for 27 days, beginning on January 23, 2017 while he was on lockdown for an "incident." (ECF No. 90 at 10). Then, after contraband was purportedly found in his cell, Duncan's commissary privileges were revoked from April 12, 2017 through September 2017. (*Id*. at 16, 22). He argues that his right to equal protection was violated because he was treated differently than other inmates who committed similar rule infractions, but they received "either fair punishment or no punishment," as compared to Duncan who was placed on commissary restriction for life and property restriction. (*Id*. at 22).

Inmates do not have a constitutional right to purchase items from the commissary. *Kimble v. Jenkins*, No. 1:19-CV-57-FDW, 2019 WL 2453615, at *3 (W.D.N.C. June 11, 2019); *Gannon v. Alyers*, No. 7:09CV00066, 2009 WL 840376, at *5 n.5 (W.D. Va. Mar. 30, 2009); *Lee v. Dir., Fed. Bureau of Prisons*, No. 5:06-CV-00452, 2009 WL 2060116, at *3 (S.D.W. Va. July 8, 2009). Regarding Duncan's allegation that he was treated differently than other inmates, the "Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike by the government." *Washington v. McAuliffe*, No. 7:16-CV-00476, 2019 WL 1371859, at *4 (W.D. Va. Mar. 26, 2019) (citing *City of Cleburne v. Cleburne Living Ctr.*, Inc., 473 U.S. 432, 439-41 (1985)). To establish a violation of the Equal Protection Clause, Duncan "must show that he has been treated differently from others who are similarly situated, and that the unequal treatment was intentional or purposeful." *Id.* If he "makes such a showing, the court then determines whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).

Duncan's conclusory allegation that his punishment regarding property and commissary restrictions was more severe than other inmates who committed similar infractions does not pass muster. He does not identify any similarly situated inmates or provide any specific facts that he was treated differently, and that the unequal treatment was intentional or purposeful. *Jones v. W. Tidwater Reg'l Jail*, 187 F. Supp. 3d 648, 659 (E.D. Va. 2016) ("Plaintiff simply has not stated any facts whatsoever to meet this standard and support his equal protection claim; therefore, Plaintiff's allegations against Defendants are insufficient to "raise the right to relief above the speculative level.'") (quoting *Bell,* 550 U.S. at 555).

Therefore, the undersigned **FINDS** that Duncan fails to state a claim under § 1983 regarding the loss of his commissary privileges, and the undersigned **RECOMMENDS** that the presiding district judge grant Defendants' motion to dismiss this claim.

### 5. Religion

According to Duncan, he was unable to effectively practice his religion from April 12, 2017 until April 24, 2017 because his Bible and religious materials were removed from his cell while he was on property restriction. (ECF No. 90 at 13, 21). He asserts claims under RLUIPA and the First Amendment. RLUIPA provides, in relevant part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Johnson v. Fields*, No. 2:14-CV-38-FDW, 2017 WL 5505991, at *11 (W.D.N.C. Nov. 16, 2017) (quoting 42 U.S.C. § 2000cc-1(a)). The plaintiff bears the initial burden under RLUIPA to show that the challenged policy "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, [ ] or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." *Id.* (citing 42 U.S.C. § 2000cc-2(b), *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015), and *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006)).

As for Duncan's First Amendment claim, the Supreme Court applied the First Amendment to the states through the Fourteenth Amendment. *Id.* (citing *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947)). "To state a free exercise claim under the First Amendment,

a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief." *Id.* (citing *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989)).

In *Johnson*, a pretrial detainee similarly argued that his constitutional rights and his rights under RLUIPA were violated when detention center officials did not allow him to keep his Bible in his cell for weeks. *Id.* at *1. The district court noted that the removal of the plaintiff's Bible for 24 days was a temporary restriction, which derived solely from the plaintiff's self-created disciplinary problems, and it was not a substantial burden on the exercise of his religion. *Id.* at *13. In another case, a district court found that a plaintiff did "not indicate how his inability to possess his Bible for a few weeks has substantially burdened his practice of sincere, religious beliefs — a showing he must make for a free exercise claim," and the court found that the claim should be summarily dismissed. *Herron v. McCoy*, No. 7:19CV00049, 2019 WL 527517, at *2 (W.D. Va. Feb. 11, 2019).

Likewise, in this case, Duncan does not allege facts sufficient to state a claim that the removal of his Bible and religious material from his cell for less than two weeks substantially burdened the exercise of his religion. Therefore, the undersigned **FINDS** that Duncan does not state a claim under § 1983 regarding the temporary removal of his religious material from his cell, and the undersigned **RECOMMENDS** that the presiding district judge grant Defendants' motion to dismiss this claim.

### 6. Access to Courts

Duncan asserts that Defendants also removed from his cell his writing and legal materials while he was on property restriction from April 12, 2017 until April 24, 2017. (ECF No. 90 at 14). He contends that he was allowed to access his legal material in the law library only once during that time period, although his criminal trial was scheduled

to begin on April 26, 2017 and he had requested extra time in the law library. (*Id*. at 15). Also, on April 19, 2017, Duncan was supposedly denied his "indigent pack," which included stamped envelopes and writing supplies because he could not have those items while on property restriction. (*Id*.). According to Duncan, he could not communicate with his lawyer because his lawyer did not accept collect calls, Duncan "did not have money on his phone," and he was not given his stamped envelopes, paper, and pen. (*Id*.). Duncan claims that he "had to take a Kennedy plea" to the criminal charges as result of not being able to prepare for trial. (*Id*.). Duncan also contends that he was refused writing materials to take notes during his April 13, 2017 video conference with the undersigned in cases 3:16-cv-11097 and 3:16-cv-11100, and he "became confused in his lawsuit because of this." (*Id*. at 14).

"Inmates have a right to meaningful access to the courts, which requires that individuals acting under color of state law cannot hinder an inmate in his efforts to pursue a legal claim." *Cannon v. Hull*, No. 1:16-CV-359 (LMB/TCB), 2017 WL 359184, at *7 (E.D. Va. Jan. 23, 2017), *appeal dismissed,* 693 F. App'x 187 (4th Cir. 2017) (citing *Bounds v. Smith*, 430 U.S. 817, 822 (1977)) and *Lewis v. Casey*, 518 U.S. 343 (1996)). Yet, the right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis*, 518 U.S. at 355. Rather, inmates cannot be impeded from attacking their sentences, directly or collaterally, or challenging the conditions of their confinement. *Id*. The Supreme Court of the United States has "extended this universe of relevant claims only slightly, to civil rights actions—*i.e.,* actions under 42 U.S.C. § 1983 to vindicate basic constitutional rights." *Id*. at 354. However, "[i]mpairment of any *other* litigating capacity is simply one of the incidental (and

41

perfectly constitutional) consequences of conviction and incarceration." *Id.* at 355.

In order to assert a colorable "access to the courts" claim, a plaintiff must allege that he suffered actual injury or specific harm to his litigation efforts resulting from such denial. *Lewis*, 518 U.S. at 351; *Michau v. Charleston Cty., S.C.*, 434 F.3d 725, 728 (4th Cir. 2006); *Prince v. Crawford*, No. 3:16-CV-02317, 2017 WL 2991350, at *10 (S.D.W. Va. May 31, 2017), *report and recommendation adopted,* No. CV 3:16-2317, 2017 WL 2991344 (S.D.W. Va. July 13, 2017) (collecting cases); *Hundley v. Thomas*, No. 5:17-CT-3110-BO, 2017 WL 6759609, at *1 (E.D.N.C. Nov. 17, 2017), *aff'd,* 719 F. App'x 250 (4th Cir. 2018). "A plaintiff must make specific allegations as to the actual injury sustained," and "[c]onclusory allegations are not sufficient in this regard." *Winston v. Mannis*, No. 7:18-CV-00226, 2019 WL 1601493, at *3 (W.D. Va. Apr. 15, 2019) (citations omitted).

To the extent that Duncan attempts to challenge the validity of his Kennedy plea under the guise of § 1983, the claim is barred. A court must dismiss a § 1983 claim when a judgment in the plaintiff's favor would imply the invalidity of his criminal conviction or sentence, unless the plaintiff can demonstrate that the conviction or sentence has been invalidated. *Heck v. Humphrey*, 512 U.S. 477, 484–87 (1994). In this case, a finding that Duncan was denied access to the courts or counsel would necessarily imply the invalidity of his conviction. Therefore, as Duncan's criminal conviction has not been reversed, expunged, or otherwise invalidated, the relief which he seeks relating to access to the courts in his criminal case is unavailable to him in this action. A civil lawsuit under § 1983 seeking damages for alleged violations of one's constitutional rights under the color of state law is not a substitute for a direct appeal or habeas review. Here, Duncan's claims relating to lack of access to the law library, legal materials, and indigent supplies to contact his lawyer regarding his criminal case are undoubtedly a thinly veiled collateral

attack on his criminal conviction, which is barred by *Heck*.

Furthermore, "[i]t is well-established that representation by counsel negates a prisoner's claim of lack of access to the courts." *Hundley v. Thomas*, No. 5:17-CT-3110-BO, 2017 WL 6759609, at *2 (E.D.N.C. Nov. 17, 2017), *aff'd,* 719 F. App'x 250 (4th Cir. 2018) (citing *Hause v. Vaught*, 993 F.2d 1079, 1084 (4th Cir. 1993) (stating that a prisoner's right to meaningful court access may be satisfied by providing prisoner with "adequate assistance from persons trained in the law")). Duncan does not claim that he was restricted from meeting with his lawyer or that his lawyer was in any way restricted from calling, writing, or communicating with him. Duncan merely states that for 12 days while on property restriction he was not allowed to review his legal materials and access the law library as much as he would have liked in view of his upcoming trial date, and he was denied stamps and writing materials to write his lawyer. "Although prisoners maintain a right of access to the courts, they do not necessarily have the right of access to a law library." *Davis v. Simons*, No. 2:14CV69, 2014 WL 11512860, at *2 (E.D. Va. Oct. 1, 2014), *aff'd,* 594 F. App'x 141 (4th Cir. 2015) (citing *Strickler v. Waters*, 989 F.2d 1375, 1385 (4th Cir. 1993)). In addition, "[p]rison officials, exercise 'wide discretion' in determining the manner and method that inmates will be allowed to access the court system and their attorneys; prisoners are not entitled to any particular method of access to the courts or to their lawyers." *United States v. Lentz*, 419 F. Supp. 2d 820, 835 (E.D. Va. 2005) (citing *Bounds v. Smith,* 430 U.S. 817, 833 (1977). Duncan asserts no plausible relationship between defendants' alleged actions in temporarily removing his property from his cell and limiting him to the one hour per week in the law library, which Duncan admits is the policy applied to all inmates in the WRJ, and any demonstrable injury. (ECF No. 90 at 14-15).

Finally, Duncan's bald assertion that he "became confused" in a civil lawsuit because he was not provided materials to take notes during a status conference is insufficient to state a claim. "To make out a prima facie case of denial of access to the courts, the inmate cannot rely on conclusory allegations; instead, he must identify with specificity an actual injury resulting from official conduct. *Cannon*, 2017 WL 359184, at *7 (citing *Cochran v. Morris*, 73 F.3d 1310, 1316 (4th Cir. 1996)). "Actual injury requires the inmate to demonstrate that his nonfrivolous, post-conviction or civil rights legal claim has been frustrated or impeded." *Id.* Duncan does not point to any specific harm to his litigation efforts that resulted from not taking notes during the hearing. In any event, Duncan received written orders from the court summarizing the key points of the status conference.

For all of the above reasons, the undersigned **FINDS** that Duncan fails to state a colorable claim under § 1983 that he was denied access to the courts, and the undersigned **RECOMMENDS** that the presiding district judge grant Defendants' motion to dismiss this claim.

### 7.    Bed Mat

Duncan stated that during his property restriction from April 12, 2017 until April 24, 2017, he could only have his bed mat from 11:00 p.m. to 7:00 a.m., but officers gave him his mat late seven times, and he still had to return the mat at 7:00 a.m. (ECF No. 90 at 18-19). Further, Duncan alleged that the time frame that he was provided a mat to sleep was the same time frame that he was permitted to leave his cell for hygiene and outside recreation, which forced him to choose between those activities. (*Id.* at 19). According to Duncan, he had to lie and sleep on cold bare concrete most of the time, and he suffered from lack of sleep, depression, anxiety, and sores on his body. (*Id.* at 21-22).

44

Duncan's claim that he had to sleep on bare concrete for a period of time while incarcerated is, unfortunately, not uncommon in the institutional setting. However, while the deprivation of a mattress for an extended period could rise to the level of a constitutional violation, short-term mattress deprivations, such as those alleged in this case, do not amount to punishment. *Willis v. Clark*, No. 3:12-CV-03452, 2012 WL 5397115, at *5 (S.D.W. Va. Oct. 9, 2012), *report and recommendation adopted,* 2012 WL 5397113 (S.D.W. Va. Nov. 5, 2012) (collecting cases); *Cook v. Commission'er of the Virginia Dep't of Corr.*, No. 7:15CV00483, 2015 WL 6443115, at *1, 2 (W.D. Va. Oct. 23, 2015) (finding that plaintiff failed to state a constitutional claim when he alleged that while in segregation his mattress was only returned to him between the hours of 11:00 p.m. and 7:00 a.m., and, without his mattress, he had to sit or lie down for hours on bare concrete, which allegedly aggravated his documented neck and back pain conditions); *Wilson v. Cleveland Cty. Sheriff's Dep't,* No. 1:12-CV-39-RJC, 2012 WL 2090605, at *3 (W.D.N.C. June 11, 2012) ("In sum, Plaintiff has failed to show that the temporary, intermittent removal of his mattress during the day [while in lockdown] supports a constitutional or statutory violation which is actionable in a Section 1983 claim.").

Therefore, the undersigned **FINDS** that Duncan fails to state a claim under § 1983 regarding the temporary intermittent removal of his bed mat, and the undersigned **RECOMMENDS** that the presiding district judge grant Defendants' motion to dismiss this claim.

### 8.  Failure to Protect

Duncan asserts that Mannon allowed eight inmates to cap their cell doors and escape, and they attacked Duncan from behind while he was watching television on July 21, 2017. (ECF No. 90 at 23). Duncan stated that one inmate hit him in the back of his

head with the "bottom of a push broom," and he was punched and kicked until he was "knocked out." (*Id.*) When he regained consciousness, he went to his cell and pushed the call button for Mannon to shut his cell door, but she ignored him, and one of the attacking inmates threw the push broom bottom at his head from approximately three feet away and Duncan "partially blocked it with his left wrist." (*Id.* at 24). Mannon finally shut the door. (*Id.*).

According to Duncan, the ringleader of the inmates who assaulted him was known to be a violent inmate. Duncan himself witnessed the inmate attack other inmates on two separate occasions within the prior four to six weeks. (*Id.* at 27). Duncan described the details concerning the attacks of other inmates that he witnessed. (*Id.* at 27-28). Duncan asserted that the inmate capped his door to allow him the freedom to assault his victims, and although he was "known for capping his cell door and assaulting other inmates," he was never charged with rule infractions and precautions were never taken to protect other inmates. (*Id.* at 27, 29). Duncan alleged that inmates at the WRJ capped their doors on almost a daily basis and "staff and administration knew of this and did not do anything to change it." (*Id.* at 29). Duncan claimed that he still suffered pain in his wrist from blocking the push broom bottom, and he had continuing physical and mental trauma from the assault. (*Id.* at 31).

Duncan also mentions other defendants relating to this incident. He identifies numerous defendants that he contends are responsible for not maintaining control of tools and cleaning supplies, asserting that the push broom should not have been in the section at the time he was attacked. (*Id.* at 30). Further, he asserts that "C.O. John Doe, A pod rover, failed to do a security check to ensure all cell doors were locked before [Duncan] came out for hygiene and was attacked." (*Id.*). Duncan claims that the most

recent security check was five hours before the attack. (*Id.*).

Under the Eighth Amendment, inmates have a right to be protected by prison officials from "violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833-34 ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.") A prison official violates an inmate's Eighth Amendment right to protection when the official knows of, but disregards, "an excessive risk to inmate ... safety." *Id.* at 837.

Duncan's claims that numerous defendants failed to maintain control of the push broom and that a correctional officer failed to perform a security check to make sure that the other inmates' doors were locked before Duncan came out of his cell are not viable under § 1983 because Duncan does not assert any facts that any of the individuals had a sufficiently culpable state of mind. He does not allege that the push broom was used in any prior attacks or that any of the defendants had any reason to know that it would be used to attack Duncan, and they chose to disregard that risk. Duncan does not assert that the officer who failed to perform the security check knew or should have known of any particular threat against Duncan, the other inmates' propensity for violence, or that the inmates routinely capped their doors and escaped. At most, Duncan asserts that such defendants were negligent in allowing the push broom to remain in the unit and not performing a security check. *Bradshaw v. Harden*, No. 7:10CV00225, 2010 WL 2754319, at *3 (W.D. Va. July 12, 2010), *aff'd,* 401 F. App'x 805 (4th Cir. 2010) (dismissing inmate's claim that the defendants failed to enforce the cleaning supplies policy and monitor the long handled broom and mop that was used to attack him, stating that he failed "to demonstrate that defendants knew of a specific risk that inmates would be harmed by long-handled cleaning equipment and so fails to prove that their failure to enforce the

policy constituted deliberate indifference that caused him to be injured).

Next, regarding Duncan's claims that Mannon failed to protect him and facilitated the assault, Mannon argues that the claims are barred by the two-year statute of limitations. The assault occurred on July 21, 2017. Although Duncan asserted the claims regarding Mannon in his March 26, 2019 motion to supplement his amended complaint and attached supplemental complaint, he agreed at the status conference to withdraw that motion in favor of his July 30, 2019 motion to amend and attached second amended to complaint that included all of his claims within one document. (ECF Nos. 74, 74-1 at 6-7, 85, 85-1). The court granted him leave to file the second amended complaint and it was filed as of the date of the hearing on August 15, 2019. (ECF Nos. 88, 89 at 2).

It is disingenuous to argue that these claims are time-barred. Duncan alleged them in his motion to amend well within the two-year statute of limitations. Duncan only agreed during the status conference to withdraw that motion in order to file a unitary pleading containing all of the claims within one document. Consequently, it would be patently unfair to this *pro se* litigant to now conclude that such claims are untimely.

However, such a decision need not be made because the Fourth Circuit has stated that the statute of limitations is tolled while a prisoner is exhausting his available administrative remedies. *Battle v. Ledford*, 912 F.3d 708, 720 (4th Cir. 2019). Duncan asserts that he filed administrative grievances at the WRJ concerning the July 21, 2017 incident and all were unanswered except for one response on September 20, 2019. (ECF No. 193 at 13). He attached to his second amended complaint copies of such grievances. (ECF No. 90-1 at 56-59). Duncan submitted a grievance on July 22, 2017, stating that he was attacked due to Mannon's actions, and he described that the doors were capped, there was not a security check for five hours before the assault, and the ringleader of the attack

48

should not have been housed in that section. (*Id.* at 57). Aldridge responded to the grievance on September 20, 2017. (*Id.*). Even if the statute of limitation on this claim began running on the exact date that Aldridge responded to this grievance, Duncan timely raised the claim in his second amended complaint, which was officially docketed in August 2019.

Regarding Mannon's argument that Duncan failed to exhaust his administrative remedies, the Prison Litigation Reform Act ("PLRA") requires inmates to exhaust administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.") (citations and internal quotation marks omitted)). However, administrative exhaustion is "not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner." *Hart v. Roderick*, No. CV GLR-15-2054, 2016 WL 3940219, at *3 (D. Md. July 21, 2016) (citations omitted).

Instead, exhaustion is an affirmative defense, and the defendant bears the burden of proving that a prisoner failed to exhaust administrative remedies. *Id.* The Supreme Court of the United States ("Supreme Court') has acknowledged the mandatory exhaustion requirement found in § 1997e, but also pointed out that the statute contains

one explicit exception; the inmate need not exhaust "unavailable" remedies. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court provided examples of unavailable remedies, noting "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 1860. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.*

At this early stage of litigation, neither party has had an opportunity to develop and produce evidence determinative of the exhaustion issue. Based on the limited record before the court, it would be premature to dismiss Duncan's claim for failure to exhaust administrative remedies. *See Custis v. Davis,* 851 F.3d 358, 361–62 (4th Cir. 2017) (discussing that it is a rare, exceptional instance where administrative exhaustion is apparent on the complaint's face and noting that the inmate's statement that he attempted to exhaust his administrative remedies "may equally imply that he attempted, but could not, exhaust his administrative remedies—and thus, that he exhausted all remedies that were available to him."); *White v. Van Duncan*, No. 1:10-cv-014, 2010 WL 2813492, at *2 (W.D.N.C. July 15, 2010) (finding that, based on the limited record and viewing the allegations in the light most favorable to the plaintiff, the plaintiff attempted

to utilize the administrative grievance procedure and his grievances were ignored and it would be improper to dismiss the complaint for failure to exhaust, as the issue could be raised later in a motion for summary judgment); *Brightwell v. Hershberger*, No. CV DKC 11-3278, 2016 WL 5815882, at *2 (D. Md. Oct. 5, 2016) ("The practical availability of remedies is not a pure question of law. As the Supreme Court noted when remanding *Ross v. Blake*, determining whether administrative remedies are truly available requires development of a record of facts and evidence relating to whether the administrative process operated as a dead end, whether it was knowable by an ordinary prisoner, and whether officials thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentation.") (citations omitted). For that reason, the undersigned finds that the record currently does not support dismissal of the complaint on the basis of failure to exhaust administrative remedies.

Turning to the substance of the claim, Duncan asserts that Mannon failed to protect him from the other inmates who attacked him. The court has addressed claims similar to Duncan's in other actions. For instance, in *Smith*, an inmate alleged that an officer allowed an inmate to cap his door to prevent it from locking, and the inmate exited his cell and attacked Smith. *Smith v. W. Reg'l Jail Med.*, No. 3:16-CV-12736, 2017 WL 4277152, at *9 (S.D.W. Va. Aug. 22, 2017), *report and recommendation adopted,* No. CV 3:16-12736, 2017 WL 4248871 (S.D.W. Va. Sept. 25, 2017). Smith alleged "that Adkins, who was working the tower that day, would have known that the inmate's cell was capped, because the cell would have shown up as unlocked on Adkins's monitor," and "that the Jail staff was aware of threats made by the inmate to Smith, and that he had placed a 'Keep Away' on the inmate to prevent any future contact with him." *Id.* Smith claimed that he had "seen many inmates cap their cell doors when Adkins [was] in the tower,

because Adkins does not care about the protection of the inmates," and "that Adkins hate[d] people with charges like those lodged against Smith," suggesting "that Adkins intentionally facilitated Smith's beating by the other inmate." *Id.* The court found that such allegations survived Adkins' motion to dismiss for failure to state a claim and qualified immunity. *Id.* at *9-10.

In this matter, Duncan asserts that Mannon intentionally allowed eight inmates to cap four different cell doors, escape, and attack Duncan from behind while he was watching television on July 21, 2017 while he was in protective custody. (ECF No. 90 at 23). When he regained consciousness from the attack, he went to his cell and pushed the call button for Mannon to shut his cell door, but Mannon refused to acknowledge the call button. (*Id.* at 24). Duncan began kicking his cell door "really hard and yelling help again." (*Id.*). The inmates again surrounded him, and Mannon continued to ignore Duncan's pleas for help, at which time one of the attacking inmates threw the push broom bottom at Duncan's head from approximately three feet away and Duncan "partially blocked it with his left wrist." (*Id.*). Duncan continued pressing the call button, yelling for help, and kicking the door until Mannon finally shut the door. (*Id.*). The inmates were still standing at his door when Mannon shut it. (*Id.*). According to Duncan, the ringleader of the inmates who assaulted him was known to be violent and had attacked inmates on at least two prior occasions, but precautions were not taken to protect Duncan. Duncan claimed that he personally witnessed the inmate attack other inmates four to six weeks earlier, and the inmate had similarly capped his door to assault the other victims. (*Id.* at 27, 29). Duncan alleged that inmates at the WRJ capped their doors on almost a daily basis and "staff and administration knew of this and did not do anything to change it." (*Id.* at 29). Duncan claimed that he still suffered pain in his wrist from blocking the push broom

bottom, and he had continuing physical and mental trauma from the assault. (*Id.* at 31).

The undersigned **FINDS** that accepting Duncan's factual allegations as true and in the light most favorable to him, Duncan adequately states a constitutional violation. Mannon does not argue that Duncan's right to protection under the Eighth Amendment was not clearly established at the time of the assault. Accordingly, the undersigned **RECOMMENDS** that the presiding district judge deny Mannon's motion to dismiss.

Mannon states in her memorandum in support of her motion to dismiss that should the court deem it necessary to consider documents that were not filed with the complaint, her motion should be converted to a motion for summary judgment. (ECF No. 185 at 11). She cites that Duncan alleged in his second amended complaint that he was attacked by other inmates at approximately 2330 hours (11:30 p.m.) on July 21, 2017, and he hit his call button, kicked his door, and yelled for help, but Mannon failed to respond. (ECF No. 90 at 23). Mannon attached her timecard to her motion, which reflects that she worked at the WRJ from 7:46 a.m. until 9:18 p.m. on July 21, 2017. (ECF No. 184-1 at 2). Therefore, she argues that she is entitled to summary judgment on Duncan's claims, as she was not on duty at the time of the alleged incident and cannot be held culpable for the events alleged by Duncan. (ECF No. 185 at 13). In response to Mannon's argument for summary judgment, Duncan asserts that Mannon is "still responsible for allowing the four (4) cells prior to him coming out around the time she alleges to have left to cap their cell doors and attack [Duncan]." (ECF No. 211 at 28). Duncan "still asserts that [Mannon] coordinated this attack with some of the individuals that attacked him," and "upon information and belief" she "was on duty at the time that he was released for his hygiene and therefore responsible." (*Id.*).

"Generally, a district court must refuse summary judgment where the nonmoving

party has not had the opportunity to discover information that is essential to its opposition." *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (citations omitted). This rule is especially important in the case of a *pro se* prisoner. *Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016). However, a non-moving party "cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Id.* at 638 (citation and markings omitted). In *Putney*, a plaintiff filed a *pro se* complaint under § 1983, asserting an Eighth Amendment claim that his mattress was taken for four months after a shakedown in his housing unit. *Id.* at 634. The defendants filed a motion to dismiss, or in the alternative, for summary judgment. *Id.* Putney requested discovery, yet the district court construed the motion as one for summary judgment and granted it without addressing his discovery request. *Id.* at 634. The Fourth Circuit found that even if Putney had not requested discovery, the district court should have, in its discretion, determined that Putney was entitled to discovery before it ruled on the motion. *Id.* at 639. The Fourth Circuit pointed out that "[r]uling on a summary judgment motion before discovery forces the non-moving party into a fencing match without a sword or mask." *Id.* (citation and markings omitted). It stated that "[t]his is especially true where the information requested is in the sole possession of the moving party, and where the district court would be otherwise unable to conduct a proper summary judgment assessment without the requested evidence." *Id.* The Fourth Circuit ultimately concluded that the district court abused its discretion in failing to grant Putney's discovery request, and held that once discovery was completed, the district court could again consider the motion for summary judgment or qualified immunity, if it deemed that to be the appropriate course. *Id.* at 640–41.

There are important distinctions between *Putney* and the instant matter. First, Duncan did not explicitly request to conduct discovery, although the Fourth Circuit has indicated that the district court should reach such conclusion on its own accord when circumstances dictate. (ECF No. 211). Second, Mannon has offered almost incontrovertible proof that she was not working at the time of the alleged attack on Duncan. Nevertheless, the timecard that Mannon relies on in support of her motion for summary judgment does not fully resolve Duncan's claims that Mannon failed to protect him by knowingly allowing the cell doors to be capped, and that she facilitated the attack on him either before she left work or that she was, in fact, present at the time that it occurred. Therefore, as Duncan has not yet been permitted to conduct any discovery on this claim, the undersigned **FINDS** that Mannon's alternative request for summary judgment is premature at this time, and the motion to dismiss should not be converted to a motion for summary judgment.

### 9.    Excessive Force

Duncan claims that after he was attacked by other inmates on July 21, 2017, Sergeant Adkins took him out of his cell and put him on the ground face-down with Adkins' weight on Duncan's back even though Duncan was not resisting. (ECF No. 90 at 25). According to Duncan, Keaton then walked up and sprayed Duncan "point blank" in the face with MK-9 O.C. spray. (*Id.* at 25-26). Duncan claimed that he asked Keaton why he sprayed him, and Keaton responded that he had never sprayed anyone before and "wanted to see what it was like." (*Id.* at 30).

Like Mannon, these defendants argue that Duncan's excessive force claims are barred by the statute of limitations. However, for the reasons explained, Duncan raised the excessive force claims before the expiration of the limitation period, albeit he was later

convinced to withdraw them and file an amended pleading. Also, construing the asserted facts most favorably to the non-moving party, Duncan was exhausting his available administrative remedies at least until September 20, 2017, and the period of limitation was tolled during that time.

Turning to the defendants' arguments that Duncan fails to state a claim and they are entitled to qualified immunity, the use of excessive force against an inmate by a correctional officer plainly violates the Eighth Amendment's cruel and unusual punishment clause, *Wilkins v. Gaddy,* 559 U.S. 34 (2010), and is cognizable under 42 U.S.C. § 1983. To establish a constitutional claim of excessive force, a plaintiff must show that the defendant "inflicted unnecessary and wanton pain and suffering." *Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir.1998) (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)). This claim contains both an objective and a subjective component.

To satisfy the objective component, the plaintiff must demonstrate that the force applied was "sufficiently serious." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996). "This is not a high bar, requiring only something more than '*de minimus*' force" *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019) (quoting *Hudson v. McMillian,* 503 U.S. 1, 10 (1992)). While "mere threats or verbal abuse, without more, do not state a cognizable claim under § 1983," *Wilson v. McKeller,* 254 F.App'x 960, 961 (4th Cir. 2007) (citing *Northington v. Jackson,* 973 F.2d 1518, 1524 (10th Cir. 1992)), "'nontrivial force'" is sufficient to state a claim under the Eighth Amendment. *Brooks,* 924 F.3d at 112 (quoting *Wilkins,* 559 U.S. at 39).

With respect to the subjective element of an excessive force claim, the plaintiff must show that the defendant "acted with a sufficiently culpable state of mind." *Williams,* 77 F.3d at 761. This is a "demanding standard," because the "state of mind required ... is

wantonness in the infliction of pain." *Brooks,* 924 F.3d at 112.  When a prison official "maliciously and sadistically use[s] force to cause harm, contemporary standards of decency always are violated whether or not significant injury is evident." *Wilkins,* 559 U.S. at 37 (explaining that the "core judicial inquiry" is whether the force "was applied … maliciously and sadistically to cause harm.") (quoting *Hudson,* 503 U.S. at 7). Prison officials act with "a permissible motive—not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." *Brooks,* 924 F.3d at 113 (citation and internal markings omitted). "But corrections officers cross the line into impermissible motive—using force maliciously and for the very purpose of causing harm—when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." *Id.* (internal citations and markings omitted).

When considering an excessive force claim, the court must ask if "the force applied was in a good faith effort to maintain or restore discipline" or was simply for the purpose of causing injury. *Taylor,* 155 F.3d at 483 To make this determination, the court should examine the following factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force used: (3) the extent of the injury inflicted; and (4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them." *Chisolm v. Assoc. Warden Thompson*, No. 4:15-CV-01806-RBH, 2016 WL 4394276, at *7 (D.S.C. Aug. 18, 2016) (quoting *Whitley*, 475 U.S. at 321). "While excessive force does require malicious intent, it does not require that the prisoner victim suffer a 'significant injury.' … [A] prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 98 (4th

Cir. 2017).

Nevertheless, the lack of serious injury is not irrelevant to the Eighth Amendment inquiry. *Hudson*, 503 U.S. at 7 ("The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it."). The extent of the injury provides some indication as to the amount of force applied. *Wilkins*, 559 U.S. at 37. "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* (quoting *Hudson*, 503 U.S. at 9). "An inmate who complains of a push or a shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Hudson*, 503 U.S. at 9; *see also Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016).

Duncan asserts that after he was "in a fight," Adkins took him out of his cell, and "[o]n the way out, Sergeant Adkins took [Duncan] to the ground," and "got on [Duncan's] back and had [Duncan's] hands behind his back." (ECF No. 90-1 at 56). These facts do not establish a cognizable excessive force claim. Duncan does not assert that Adkins wantonly inflicted any pain on him or that he suffered an injury. Rather, even construing the facts in the light most favorable to the non-moving party, Duncan only alleges that Sergeant Adkins restrained him after he was in a fight. Therefore, the undersigned **FINDS** that Duncan does not state an excessive force claim against Sergeant Adkins and **RECOMMENDS** that the District Judge grant Sergeant Adkins' motion to dismiss.

However, Duncan's claim against Keaton exceeds the pleading standards previously described. Duncan asserts that Keaton sprayed him "point blank in the face" with "MK-9 O.C. spray" when he was restrained on the ground and not resisting. (ECF No. 90 at 25-26). Duncan asserted that he asked Keaton "why he sprayed him," and Keaton responded that "he had never sprayed anyone before and wanted to see what it was like." (*Id.* at 30).

Fourth Circuit "precedent establishes that the use of pepper spray on a docile prisoner could qualify as excessive force." *Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014) (citing *Iko v. Shreve,* 535 F.3d 225, 239–40 (4th Cir. 2008) (finding genuine issue of material fact when prison guard deployed several bursts of pepper spray on docile prisoner) and *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (providing that "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents, in quantities greater than necessary or for the sole purpose of infliction of pain")).

The facts asserted by Duncan, accepted as true, clearly state an excessive force claim against Keaton. Therefore, the undersigned **FINDS** that Duncan states a claim against Keaton and **RECOMMENDS** that the District Judge deny Keaton's motion to dismiss.

### 10.    False report and failure to investigate

According to Duncan, while he was in the interview room after the incident, he heard Sergeant Adkins conspiring with the other officers that responded to the assault regarding how to write up their reports since Keaton was not allowed to spray Duncan. (*Id.* at 26-27). Also, Duncan claims that Mannon lied and stated that only two inmates attacked Duncan. (*Id.* at 24-25). Sergeant Adkins supposedly refused to investigate the other six inmates involved in the assault, although Duncan told him that eight inmates attacked him. (*Id.* at 30-31).

However, Duncan did not have a federal or constitutional right to any particular type of investigation, and he does not assert any injury from the alleged false report of the incident. *Battle v. N. Carolina Dep't of Pub. Safety*, No. 1:17-CV-174-FDW, 2018 WL 4620619, at *8 (W.D.N.C. Sept. 26, 2018) (dismissing § 1983 claim that defendants failed

to adequately and truthfully investigate plaintiff's complaints about various acts of deliberate indifference and retaliation because there is no constitutional right to an investigation); *Mitchell v. Murray*, 856 F. Supp. 289, 294 (E.D. Va. 1994) (stating that there is not a "fundamental right requiring prison administrators investigate prisoner complaints."); *Jones v. Ervin*, No. 2:19-CV-385-RMG, 2019 WL 2241860, at *2 (D.S.C. May 24, 2019) ("Plaintiff has failed to state any valid claims against the Defendant officers [because the] allegations, that Plaintiff informed them of the retaliation and they allegedly ignored him and failed to investigate, do not make out a § 1983 claim."); *Witt v. Redman*, No. 7:17-CV-00438, 2018 WL 4374220, at *3 (W.D. Va. Sept. 13, 2018), *appeal dismissed*, 754 F. App'x 222 (4th Cir. 2019) ("[A]n inmate cannot bring a § 1983 claim that officials inadequately investigated a grievance or gave inaccurate responses to a grievance or an appeal. The court will grant the defendants' motion to dismiss as to any claim that they did not comply with a provision of a prison policy or the grievance procedures.")

Therefore, the undersigned **FINDS** that Duncan fails to state a claim upon which relief may be granted regarding the defendants' false report of the assault and failure to adequately investigate, and the undersigned **RECOMMENDS** that the presiding district judge dismiss these claims.

### 11.    Supervisory Liability

Duncan claims that numerous defendants "failed to hire, train and/or supervise their subordinates at WRJ while [Duncan] was housed there." (ECF No. 90 at 34). "It is well established that the doctrine of respondeat superior does not apply in § 1983 claims." *Hurt v. Corr. Ofc. Rounds*, No. CV DKC-15-596, 2016 WL 1059359, at *8 (D. Md. Mar. 17, 2016) (citing *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). In a § 1983 action, "[l]iability of supervisory officials is not based on ordinary principles of respondeat

superior, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* (quoting *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001)). In order to state a claim for supervisory liability, the § 1983 plaintiff must demonstrate that " (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

In this case, Duncan "has pointed to no action or inaction on the part of [the defendants] that resulted in a constitutional injury." *Id.*; *see also  Battle v. N. Carolina Dep't of Pub. Safety*, No. 1:17-CV-174-FDW, 2018 WL 4620619, at *9 (W.D.N.C. Sept. 26, 2018) ("Plaintiff has stated a facially sufficient claim against the foregoing supervisory Defendants by alleging that they were either personally involved in the violations or knew of their officers' and staff's actions and failed to stop them."). Even construing the facts in the light most favorable to Duncan, there is no factual foundation upon which these defendants could be held liable in their capacities as supervisors. Accordingly, the undersigned **FINDS** that Duncan fails to state a claim upon which relief may be granted regarding supervisory liability, and the undersigned **RECOMMENDS** that the presiding district judge dismiss this claim.

### 12.    Grievances

Finally, Duncan identifies many defendants to whom he addressed administrative

grievances, and he states that some of them did not respond while those who did respond were "deliberately indifferent to the violations of his constitutional rights." (ECF No. 90 at 33). However, prisoner do not have a constitutional right to an administrative grievance procedure. *See, e.g., Nolan v. Clarke,* No. 7:18-cv-00408, 2019 WL 4923953, at *6 (W.D. Va. Oct. 4, 2019) ("[I]nmates have no constitutional right to file a grievance or access any such procedure voluntarily established by the state.") (citing *Booker v. South Carolina Dept. of Corrections*, 855 F.3d 533, 541 (4th Cir. 2017). Duncan can pursue redress only for the alleged constitutional violations that were the subject of the administrative grievance, not for the inadequacies or denial of a grievance procedure. *Prince*, 2017 WL 2991350, at *13 ("Thus, if Prince's grievances concerned actions which injured his constitutionally protected interests, he could file a claim under § 1983 to seek redress for that injury; however, § 1983 does not provide him an avenue to seek redress for the state's failure to address his grievances.")*; Oliver v. Powell*, 250 F. Supp. 2d 593, 602–03 (E.D. Va. 2002) ("When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance.").

Therefore, the undersigned **FINDS** that Duncan fails to state a claim upon which relief may be granted regarding his grievances and the undersigned **RECOMMENDS** that the presiding district judge dismiss this claim.

## IV.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the presiding district judge **GRANT** the motion to dismiss filed by Defendants Keefe Commissary Network, LLC, and Janice Dennison, (ECF No. 146), and the motion to

dismiss of Defendant Rachel Adkins, (ECF No. 236); **DISMISS**, with prejudice, the second amended complaint against the foregoing defendants; and **REMOVE** them as defendants in this civil action. The undersigned further **RECOMMENDS** that the presiding district judge **DENY, in part**, the remaining defendants' motions to dismiss on the issues of exercise, administrative segregation, excessive force, and failure to protect, (ECF Nos. 132, 135, 137, 141, 143, 159, 166, 168, 170, 172, 175, 180, 182, 184, 197, 199, 201, 205, 214, 216, 219, 228, 230), as stated herein, but **GRANT** Defendants' motions to dismiss all other asserted claims. *(Id.)*.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff, Defendants, counsel of record, and any unrepresented parties.

**FILED:** May 18, 2020

Cheryl A. Eifert
United States Magistrate Judge